Jeffrey R. Freund
Zoe L. Palitz
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street N.W., 10th Floor
Washington, D.C. 20005
Telephone: (202) 842-2600
Facsimile: (212) 842-1888

*Counsel to Bakery, Confectionery, Tobacco
Workers and Grain Millers International Union and
Affiliated Local Unions Representing Debtors'
Employees*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| HOSTESS BRANDS, INC., et al.,[1] | )  Case No. 12-CV-05708 (ER) |
| | ) |
| Debtors. | ) |
| | ) |

**APPEAL OF THE BAKERY, CONFECTIONARY, TOBACCO WORKERS AND
GRAIN MILLERS INTERNATIONAL UNION FROM THE BANKRUPTCY COURT'S
DENIAL OF ITS MOTION REQUESTING ALLOWANCE AND
PAYMENT OF ADMINISTRATIVE CLAIMS**

The Bakery, Confectionery, Tobacco Workers and Grain Millers International Union, on

behalf of its thirty-five local unions who are the "authorized representatives" of certain of the

Debtors' employees and retirees (collectively, "BCTGM"), appeals pursuant to 28 U.S.C.

§ 158(a)(1) from the order of the Honorable Robert R. Drain of the U.S. Bankruptcy Court for

the Southern District of New York ("the Bankruptcy Court") denying the BCTGM's motion for

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's
federal taxpayer identification number are as follows: (i) Hostess Brands, Inc. (0322); (ii) IBC
Sales Corporation (3634); (iii) IBC Services, LLC (3639); (iv) IBC Trucking, LLC (8328); (v)
Interstate Brands Corporation (6705; and (vi) MCF Legacy, Inc. (0599).

immediate payment by the Debtors (collectively, "Hostess" or "the Company") of all post-petition collectively bargained Pension Wage Deferral payments arising from post-petition work performed by BCTGM-represented active employees.

## QUESTION PRESENTED

In its collective bargaining agreements ("CBAs") with local affiliates of the BCTGM, Hostess promised to make Pension Wage Deferral payments to a multiemployer pension fund for every hour worked by a BCTGM-represented employee as an integral part of the employees' compensation packages.  After Hostess failed to make its promised payments for 120 days, the pension fund expelled Hostess.  Does Hostess remain contractually obligated to make the Pension Wage Deferral payments for its workers as promised in its CBAs as part of the employees' collectively bargained compensation packages?

## STATEMENT OF JURISDICTION

On May 9, 2012, the BCTGM filed a motion under 11 U.S.C. §§ 503(b)(1)(A), 507(a)(2), and 1113(f) for an order compelling Hostess to make Pension Wage Deferral payments required by its CBAs.  *See* Administrative Expense Motion, Dkt. No. 863 (May 9. 2012).  On June 27, 2012, the Bankruptcy Court entered a final order denying the BCTGM's motion.  *See* Order, Dkt. No. 1168 (June 27, 2012).

"'An order allowing or disallowing a claim is a final, appealable order,'" *EDP Med. Computer Sys. V. United States*, 480 F.3d 621, 626 (2d Cir. 2007) (citation omitted), and "[n]othing in the order . . . indicates any anticipation that the decision will be reconsidered[.]" *In re Palm Coast, Matanza Shores Ltd. P'ship*, 101 F.3d 253, 256 (2d Cir. 1996).  *See also In re Gasel Transp. Lines, Inc.*, 326 B.R. 683, 685 (B.A.P. 6th Cir. 2005) ("An order determining that a claim is not entitled to administrative expense priority constitutes a final order, so the order

being challenged may be appealed as of right" (citations omitted)); *In re Morad*, 328 B.R. 264, 268 (B.A.P. 1st Cir. 2005) ("The bankruptcy court's denial of Xifaras' § 503(b) application is a final order.").

The BCTGM timely filed a notice of appeal on June 28, 2012.  *See* Notice of Appeal, Dkt. No. 1181 (June 28, 2012).  The Bankruptcy Court had original jurisdiction under 28 U.S.C. §§ 157(b), 1334.  This Court has appellate jurisdiction under 28 U.S.C. § 158(a)(1).

## STANDARD OF REVIEW

This Court reviews the final orders of a bankruptcy court as an appellate court.  28 U.S.C. § 158(a)(1).  It reviews findings of fact for clear error and conclusions of law *de novo*.  *See, e.g.*, *In re 114 Tenth Ave. Assoc., Inc.*, 441 B.R. 416, 424 (S.D.N.Y. 2010).  In this case, the Bankruptcy Court's interpretation of the BCTGM CBAs is a question of law to be reviewed *de novo*.  The sole question presented here – a narrow question of contract law – is not one within the special competence of the bankruptcy court.

## STATEMENT OF FACTS

For many years, Hostess and local unions affiliated with the BCTGM have been parties to a series of CBAs governing the wages, benefits, and working conditions of thousands of employees at the company's bakeries, depots, and retail thrift stores.  Currently, Hostess has 117 CBAs with thirty-five local unions affiliated with the BCTGM.  These CBAs were reached with each local union in and around October 2007, during the bankruptcy of Hostess' predecessor.  *See* Declaration of Frank Hurt ("Hurt Decl."), Dkt No. 863-1 at ¶¶ 2-4.

Each CBA is a bilateral agreement between a BCTGM local union and Hostess.  Each CBA requires Hostess make contributions ("Pension Wage Deferrals") to the Bakery and Confectionery Union and Industry International Health Benefits and Pension Fund ("B&C Fund"

or "the Fund") – an independent third party beneficiary of the BCTGM CBAs – in varying amounts based on hours of work performed by active Hostess employees covered by each CBA. *See id*. at ¶ 5 & Exhibit A (Local 25 CBA).  Hostess is required to make these Pension Wage Deferrals on the tenth day of each month, based on the hours worked by BCTGM represented active employees during the previous month.  These Pension Wage Deferrals are deferrals of amounts that would otherwise have been payable as wages to Hostess employees, but Hostess and the BCTGM agreed that they would instead be paid to the B&C Fund to provide post-retirement pension benefits to Hostess employees.  *See* Hurt Decl. at ¶ 6.  The relationship between Hostess and the B&C Fund is, in turn, regulated by the B&C Fund Agreement and Declaration of Trust ("Trust Agreement"), which the CBAs incorporate by reference.  *See* Omnibus Objection, Dkt. No. 1003 (May 23, 2012), Exhibit B-1, Dkt. No. 1003-2 at pp.13-22.

On August 12, 2011, Hostess informed the BCTGM and the B&C Fund that it would no longer make Pension Wage Deferrals for work performed by BCTGM-represented active employees.  *See* Hurt Decl. at ¶ 7; Declaration of Steven Brock ("Brock Decl"), Dkt. No. 1032-1 (May 29, 2012), Exhibit 1 ("Brock ULP Affidavit"), Dkt. No. 1032-2 at p. 3.  On December 10, 2011, after Hostess had failed to make its required contributions for 120 days, the B&C Fund terminated the Company's participation in the fund and assessed withdrawal liability.  *See* Brock ULP Affidavit at p. 4 (explaining the B&C Fund's policy of terminating the participation of any employer that remains delinquent on contributions for more than 120 days).

One month later, on January 11, 2012, Hostess filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code.  *See* Voluntary Petition, Dkt. No 1 (Jan. 11, 2012).  At all times since the initiation of this chapter 11 proceeding, BCTGM-represented active employees have continued to work for the Company pursuant to the CBAs.

Hostess has made no Pension Wage Deferrals for this post-petition work, although required by the CBAs to do so.  *See* Hurt Decl. at ¶¶ 8-9.[2]  As of May 9, 2012, when the BCTGM filed its administrative expense claim under section 503 of the Bankruptcy Code, Hostess owed approximately $14,000,000 in Pension Wage Deferrals accruing under the BCTGM CBAs after January 11, 2012; by now, that figure is significantly higher.  *See* Hurt Decl. at ¶ 10 & Exhibit B.

On May 9, 2012, the BCTGM filed its motion seeking treatment of the unpaid Pension Wage Deferrals as an administrative expense.  *See* Administrative Expense Motion, Dkt. No. 863 (May 9, 2012).  Nine pension funds also filed similar motions, seeking administrative expense treatment of unpaid pension contributions from Hostess.  Hostess filed an Omnibus Objection, and all motions were heard by the Bankruptcy Court on the same day.

On June 19, 2012, the Bankruptcy Court orally granted the motion of each of the nine pension funds.  *See* Transcript of June 19, 2012 Hearing ("06/19 Hrg. Tr."), Dkt. No. 1191 (July 5, 2012) at pp. 83, 89-90.  In doing so, the Bankruptcy Court found that Pension Wage Deferrals owed to these funds arising from work performed by Hostess' unionized employees after January 11, 2012, are entitled to administrative expense priority.  That ruling is not the subject of this appeal.

Notwithstanding its ruling that post-petition Pension Wage Deferrals are an administrative expense, the Bankruptcy Court denied the BCTGM's motion.  *See* Order Re Motion to Direct Payment, Dkt. 1168 (June 26, 2012).  The Court reasoned that after the B&C

---

[2] On May 4, 2012, the Court granted the Motion of Debtors and Debtors in Possession to (A) Reject Certain Collective Bargaining Agreements and (B) Modify Certain Retiree Benefit Obligations Pursuant to Sections 1113(c) and 1114(g) of the Bankruptcy Code.  *See* Order Re Motion to Reject, Dkt. No. 848 (May 4, 2012).  Since then, Hostess has not acted on its authorization to reject the CBAs and has not implemented the terms of the proposal authorized by the Court.  *See* Hurt Decl. at ¶ 11.  As a result, the BCTGM CBAs remain in force today and the Court's order authorizing their rejection has no impact on Hostess' contractual obligations.

Fund terminated the Company's participation, Hostess no longer had a contractual obligation to its BCTGM-represented employees to make these Pension Wage Deferrals.  *See* 06/19 Hrg. Tr. at p. 87.  It further concluded that the actions of the B&C Fund had rendered Hostess' contractual performance impossible.  *See id.* at pp. 87-88.  On June 28, 2012, the BCTGM appealed to this Court.

## SUMMARY OF ARGUMENT

The Bankruptcy Court's rulings with respect to bankruptcy law are not in dispute. Section 503(b)(1)(A) of the Bankruptcy Code allows, as "administrative expenses," claims for the "actual, necessary costs and expenses of preserving the estate, including- (i) wages, salaries, and commissions for services rendered after the commencement of the case[.]"  The Bankruptcy Court correctly held that Pension Wage Deferrals due as a result of employees' post-petition labor are properly classified as administrative expenses.  *See* 06/19 Hrg. Tr. at pp. 81-82.

But having concluded that post-petition Pension Wage Deferrals are entitled to administrative expense priority, the Bankruptcy Court rejected the BCTGM's claim.  In doing so, the Bankruptcy Court ignored fundamental contract principles and misinterpreted the BCTGM CBAs.  Specifically, the Bankruptcy Court erred in finding that the B&C Fund, a third-party beneficiary of the bilateral CBAs between Hostess and the BCTGM local unions, had the power relieve Hostess of its contractual obligations to its employees.  The Bankruptcy Court's ruling ignored the plain language of the B&C Fund Trust Agreement and well-established law preventing a wrong-doer from relying on the defense of impossibility to excuse its conduct.

In effect, the Bankruptcy Court held that the consequence of Hostess' delinquency – its expulsion from the B&C Fund – allows it to avoid liability for that breach and thus to pay far less than full compensation to its employees, who have continued to work to keep the Company

functioning throughout this bankruptcy.  Thus, the Bankruptcy Court's ruling holds Hostess not

liable for its knowing, repeated breach of its CBAs, and allows it to retain the portion of its

employees' compensation constituting the Pension Wage Deferrals.

The Bankruptcy Court's ruling with respect to the BCTGM is not supported by law,

equity, or common sense.  This Court should reverse.

## ARGUMENT

### A.  The B&C Fund's Termination of Hostess' Participation Does Not Relieve Hostess of its Contractual Obligations to the BCTGM

The Bankruptcy Court erred in concluding that the actions of the B&C Fund – a mere

third-party beneficiary to the BCTGM CBAs – could extinguish the rights and obligations of the

parties to those CBAs.  As the Bankruptcy Court correctly recognized, multiemployer pension

funds, like the B&C Fund, "are third party beneficiaries of the CBAs . . . ."  *See* 06/19 Hrg. Tr. at

p. 79; *accord Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery

Co.*, 118 F.3d 1018, 1021 (4th Cir. 1997) ("Because an employer's obligations to a

multiemployer plan usually arises through a collective bargaining agreement negotiated and

agreed to by the employer and union, the multiemployer plan is, under common law contract

principles, a third party beneficiary of the collective bargaining agreement."); *Bituminous Coal

Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625, 632 (D.C. Cir. 1989) ("There is no dispute that

the Trust is a third party beneficiary of the [CBA], inasmuch as its right to receive contributions

from AEC arises solely from that Agreement, although neither the Trust nor the Trustees are

parties thereto.").

Notwithstanding the Bankruptcy Court's correct understanding of the relationship

between the B&C Fund and the contracting parties, it failed to reach the conclusion that follows

from this finding: the B&C Fund is powerless to rescind the Pension Wage Deferral obligations

contained in the agreement between Hostess and its unionized employees.  *See, e.g.*, *Norwest Financial Leasing, Inc. v. Morgan Whitney, Inc.*, 787 F. Supp. 895, 900 (D. Minn. 1992) ("The general rule is that '[a] third party beneficiary may not rescind a contract'" (quoting 17A C.J.S. Contracts § 414)); *Aquatrol Corp. v. Altoona City Auth.*, No. CV-03-252J, 2006 WL 2540797, at *5 (W.D. Pa. Aug. 31, 2006) ("[I]t is well understood that a third party beneficiary cannot rescind a contract to which it has only the limited right to receive the benefits.").  *See also Schauer v. Mandarin Gems of California, Inc.*, 23 Cal. Rptr. 3d 233, 240-41 (Cal. Ct. App. 2005).  Hostess and the BCT possess the exclusive right to rescind or otherwise modify the CBAs.  The B&C Fund does not.

  The Bankruptcy Court not only ignored general principles regarding the limited rights of third party beneficiaries, it ignored federal case law explicitly recognizing that the trustees of multiemployer pension plans cannot alter the obligations of the parties to a CBA.  In *N.L.R.B. v. Amax Coal Co., a Div. of Amax, Inc.*, 453 U.S. 322, 336 (1981), the Supreme Court held that pension fund "trustees do not bargain with each to set the terms of the employer-employee contract; they can neither require employer contributions not required by the original collectively bargained contract, *nor compromise the claims of the union or the employer with regard to the latter's contributions*" (emphasis added).  Because "pension fund trustees . . . cannot, as a matter of law, be considered union agents[,]" *N.L.R.B. v. Truck Drivers Local Union No. 449, Int'l Broth. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 728 F.2d 80, 87 (2d Cir. 1984), the trustees "are not in a position to participate in the collective bargaining process," *Prof'l Administrators Ltd. v. Kopper-Glo Fuel, Inc.*, 819 F.2d 639, 644 (6th Cir. 1987).  As a result, they "'have no power to resolve issues that are properly the subject of collective bargaining.' . . . [And] the amounts to be contributed by an employer to a trust fund are a matter

for collective bargaining."  *Id.* (quoting *Hauskins v. Stratton*, 721 F.2d 535, 537 (5th Cir. 1983)).

*See also Hawkins v. Bennett*, 704 F.2d 1157, 1159 (9th Cir.1983) ("the [CBA] fixes the

employer's contribution to the fund . . . ."); *Botto v. Friedberg*, 568 F. Supp. 1253, 1258

(E.D.N.Y. 1982) ("[D]ecisions to be made in the collective bargaining arena cannot be made by

pension fund trustees.").

The principles announced in *Amax Coal* have been applied in cases, like the instant case,

where a pension fund has attempted to modify an employer's obligations under a CBA.  For

example, in *United Food & Commercial Workers v. Super Fresh Food Markets Inc*., CIV. 04-

1226 (RMB), 2008 WL 3874304 (D.N.J. Aug. 19, 2008), *aff'd*, 352 F. App'x 721 (3d Cir. 2009),

pension fund trustees attempted to raise the contributions required of employers.  In rejecting the

claim against the employer, the court found that "the CBAs clearly stated that the employer

would be obligated to pay the established rate per each active employee.  The Trustees could not

alter the explicitly stated portion of the contribution obligation that was collectively bargained."

*Id*. at *23.  The court held that "the unilateral change to the employers' contribution requirement

to the Fund, as implemented by the Trustees, changed the manner of the contribution set forth in

the CBAs without resorting to the collective bargaining process[,]" and was therefore "[c]ontrary

to federal labor policy[.]"  *Id*.  at *24.  *See also Kopper-Glo*, 819 F.2d at 640 ("We find that the

arbitration award permitting trustees of pension and welfare funds to increase contribution rates

is contrary to public policy that requires wages and benefits to be collectively bargained and is

therefore unenforceable.").

The flip side is also true.  In *Merlino's Macaroni, Inc. v. Local 9, Bakery, Confectionery & Tobacco Workers Int'l Union*, No. C92-1405R, slip. op. at 1-3 (W.D. Wash. 1993),[3] a pension fund authorized an employer to *reduce* its contributions to an amount below the amount required in the CBA, while still maintaining the same level of benefits.  The union filed a grievance, claiming that the employer had violated the CBA by reducing its contributions.  The arbitrator found in the union's favor and ordered the employer to pay the exact contribution amount stated in the CBA.  The arbitrator noted that because there was "absolutely no ambiguity" in the CBA provisions that required a fixed contribution to the fund per hour worked by employees, the employer was bound notwithstanding the pension fund's decision to reduce the contribution required to maintain the same level of benefits.  *Id*. at p. 20.  The arbitration award was affirmed on review by the district court.  *Id*. at p. 6.

In its Omnibus Objection, Hostess argued that the B&C Fund trustees determined that Hostess no longer had any pension obligations under its CBAs and BCTGM "cannot now take a position contrary to the one made by the B&C Fund fiduciaries. . . ."  *See* Omnibus Objection at ¶ 30.  That proposition simply is not true; indeed, it is the exact reverse of the governing legal principles.  As *Amax Coal* and its progeny make clear, the Fund is not the bargaining agent for the BCTGM.  It cannot, as a third-party beneficiary, alter the rights of the BCTGM or the obligations of Hostess under the CBAs.  Relying on the decision of the Fourth Circuit in *Ralph's Grocery*, the Bankruptcy Court concluded the opposite.  As we explain below, the Bankruptcy Court entirely misread that decision.

---

[3] The district court order and arbitration award were attached to the BCTGM Reply Brief, Dkt. No. 1032-2 (May 29, 2012).

Under common law, a third-party beneficiary is entitled enforce its right to promised benefits to the same extent as the promisee.  *See, e.g.*, *Smith v. Mitlof*, 198 F. Supp. 2d 492, 506 (S.D.N.Y. 2002) ("A third-party beneficiary may enforce contractual obligations without being an actual party to a contract."); *Lloyd v. Hovensa, LLC*, 369 F.3d 263, 273 n.11 (3d Cir. 2004) (recognizing "the fundamental principle of contract law that an intended beneficiary to a contract may enforce a promise made by the promisor. . . ."); Restatement (Second) of contracts § 304 (1981) ("A promise in a contract creates a duty in the promisor to any intended beneficiary to perform the promise, and the intended beneficiary may enforce the duty.").

This common-law right has been augmented by federal statute.  Section 515 of ERISA allows multiemployer pension plans to enforce their rights under the bilateral CBAs that benefit them.  *See* 29 U.S.C. § 1145.  Section 515 "increases the reliability of [multiemployer pension plans'] income streams, reduces the cost and delay associated with collection actions, and reduces or eliminates the cost of monitoring the formation of collective bargaining agreements." *Ralph's Grocery*, 118 F.3d at 1022.

But by citing *Ralph's Grocery* in support of his order, *see* 06/19 Hrg. Tr. at p. 87, the Bankruptcy Court confused the very real power of the B&C Fund (or any fund) to *enforce* the CBAs under section 515, with the Fund's non-existent power to *unilaterally rescind* the Pension Wage Deferral provisions of the CBAs.  In *Ralph's Grocery*, the pension fund sought contributions based on hours for which employees received severance pay.  It pointed to the pension provision of the parties' CBA, which required such contributions, and the "standard clause" contained in the CBA, which stated that it "encompasses the sole and total agreement between the Employer and the Union with respect to pensions or retirement." *Ralph's Grocery*, 118 F.3d at 1022.  The Fourth Circuit held that the pension fund was entitled to these

contributions, even where a separate provision of the CBA prohibited pension contributions for severance pay. *Id.* It did so because

> [b]y virtue of section 515, the Fund is permitted to rely on and enforce the literal meaning of the Company's representation [in the CBA that the pension contribution clause was the sole and total agreement with respect to pensions] . . . . The Fund was not required to comb through the other parts of the collective bargaining agreement searching for additional terms related to pensions.

*Id.* at 1023-24 (emphasis added). The court noted that allowing the pension fund to rely upon the CBA's standard clause "reduces the cost of administering the Fund," one of the primary purposes of section 515. *Id.* at 1024. Thus, contrary to the Bankruptcy Court's reasoning, *Ralph's Grocery* stands only for the proposition that the B&C Fund would be entitled to enforce its right to contributions under the BCTGM CBAs. Nothing in the opinion stands for the proposition for which it was cited in the Bankruptcy Court's oral ruling – that if the B&C Fund is no longer entitled to contributions due to its decision to terminate Hostess' participation, the union is similarly no longer entitled to its bargain. *See* 06/19 Hrg. Tr. at p. 87 ("Given that the debtor no longer has such an obligation under the pension trust agreement or trust fund agreement, those provisions govern under the CBA by the express terms of the CBA." (citing *Ralph's Grocery*, 118 F.3d 1018)).

**B. The Language of the Trust Agreement Undermines the Bankruptcy Court's Ruling**

The Bankruptcy Court also ignored plain language in the Trust Agreement that distinguishes between Hostess' obligations to the B&C Fund and to the BCTGM. The crux of Hostess' argument, which the Bankruptcy Court adopted, is that because "Hostess' obligations to contribute *to the B&C Fund* permanently ceased . . . [when] the B&C Fund made its determination and assessed withdrawal liability in December 2011[,]" *see* Omnibus Objection at

¶ 30 (emphasis added), the Company no longer had any pension obligations *to the BCTGM* under the CBAs.

But under the plain language of the Trust Agreement, the B&C Fund could terminate Hostess for delinquency regardless of the Company's obligations to the BCTGM under the CBAs.  Specifically, Article V, Section 2 of the Trust Agreement provides that contributions to the Fund "shall continue to be paid as long as the Employer is so obligated pursuant to the Collective Bargaining Agreement with the Local Union *or until he ceases to be an Employer within the meaning of this Agreement and Declaration of Trust* . . . ."  *See* Omnibus Objection, Exhibit B-1 at p. 18 (emphasis added).  Article XII, Section 1 then explains the circumstances under which "[a]n Employer . . . ceases to be an Employer within the meaning of this Agreement and Declaration of Trust . . . ."  *Id.* at p. 21.  This can occur in one of two ways: when the employer is "no longer obligated, pursuant to a Collective Bargaining Agreement with a Local Union, to make contributions to this Pension Fund, *or, as determined by the Trustees, when he is delinquent in his contributions or reports to the Pension Fund.*"  *See id.* (emphasis added).

Notably, both of these provisions are phrased in the disjunctive.  Use of the disjunctive term "or" within a contract typically "expresses an alternative."  *Portside Growth and Opportunity v. Gigabeam Corp.*, 557 F. Supp. 2d 427, 431 (S.D.N.Y. 2008); *see also United States v. Smith*, 785 F. Supp. 52, 54 (S.D.N.Y. 1992) ("[A] contract containing an option 'to purchase Greenacre for $5,000, Blackacre for $4,000, or Greenacre and Blackacre for $8,000' would be viewed as plainly disjunctive, and plainly providing the promise with three options. . . .").  This "indicate[s] that either of the separated words or phrases may be employed without the other . . . . and requires that those alternatives be treated separately."  1A <u>Sutherland Statutory Construction</u> § 21:14 (7th ed. 2011).

Here, treating those alternative contingencies separately means understanding that termination for delinquency stands apart from Hostess' obligations under the CBA. The Trust Agreement describes two separate "alternative[]" circumstances, *see* <u>Sutherland</u> § 21:14, under which Hostess may cease contributions to the Fund: (1) when it is no longer obligated to make contributions pursuant to a CBA; *or* (2) when it ceases to be an Employer under the Trust Agreement. Then, the Trust Agreement describes two separate "alternative[]" circumstances under which Hostess could cease to be an Employer within the meaning of the Trust Agreement: (1) when it is no longer obligated to make contributions pursuant to a CBA; *or* (2) when the Trustees deem it to be delinquent.

When the Trustees terminated Hostess, they did so because they determined that Hostess was delinquent in its obligations to the Fund. They did not terminate Hostess because it ceased to be obligated to the BCTGM under CBAs. Indeed, there is no question that at the time the trustees terminated Hostess' participation in the Fund, it *was* obligated pursuant to its CBAs to make negotiated pension payments for the benefit of its employees for every hour each employee worked. Those CBAs were in effect when the Fund terminated Hostess. They remain in effect today. Nothing the Fund did affected Hostess' contractual obligations to its employees. In other words, the Trustees' determination that Hostess was "delinquent," *see* Article XII, Section 1, and therefore no longer an "Employer" under the Trust Agreement, *see* Article V, Section 2, invokes only the second of two alternative scenarios laid out in the Trust Agreement. While such a determination by the Trustees was sufficient to terminate Hostess' obligation to the Fund, it does not by its terms mean that the Company is no longer "obligated pursuant to the Collective Bargaining Agreement with the Local Union," *see id*.

The Bankruptcy Court's ruling, however, collapsed these alternative contingencies. By its analysis, the Trustees' determination that Hostess was delinquent is equivalent to the cessation of Hostess' obligations under its CBAs. *See* 06/19 Hrg. Tr. at p. 87. This interpretation departs from "the basic contract law principle[] that contracts are to be interpreted as a whole," *United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (Sotomayor, J.) (quoting Restatement (Second) of Contracts § 202(2) (1981) and 11 Richard A Lord, Williston on Contracts § 32:5 (4th ed. 1999)), which requires "giving effect to each of [a contract's] provisions, where possible." *Arthridge v. Aetna Cas. And Sur. Co.*, 604 F.3d 625, 631 (D.C. Cir. 2010). This helps ensure "that no word is superfluous." *In re Motors Liquidation Co.*, No. 09-50026(REG), slip op. at 7 (Bankr. S.D.N.Y. Jan. 5, 2011). By equating delinquency with the cessation of obligations under the CBA, the Bankruptcy Court eliminated the independent meaning of the two disjunctive clauses.

Another, more faithful interpretation is available: when the Trustees terminated Hostess for delinquency under the Trust Agreement, their action was wholly unrelated to Hostess' continuing obligations to its employees under the CBA. Although the CBAs incorporate the Trust Agreement, they are not subsumed by it. Hostess' promises to its employees remain unchanged.

**C. The Doctrine of Impossibility Does Not Excuse Hostess' Breach**

The Bankruptcy Court also erred in holding that the actions of the B&C Fund made it legally impossible for Hostess to meet its pension obligations to the BCTGM. Specifically, the Bankruptcy Court concluded that the CBAs "provide for an obligation to make the pension contribution to the pension fund and that contribution is, at this point, precluded by the actions of the pension fund. And, therefore, by the plain terms of the agreement the debtor cannot make the

payment that is required." *See* 06/19 Hrg. Tr. at pp. 87-88.  Despite acknowledging that Hostess' *own* delinquency caused its expulsion, the Bankruptcy Court held that because "the B&C fund was not compelled to terminate the debtors' participation, but chose to do so, [ ] the doctrine of impossibility would apply here. . . ." *Id*. at p. 88.  That conclusion is entirely at odds with settled law.

The doctrine of impossibility is "essentially . . . an equitable one to be applied when fair and just."  *Opera Co. of Boston, Inc. v. Wolf Trap Found. for Performing Arts*, 817 F.2d 1094, 1099 (4th Cir. 1987).  It excuses a party from fulfilling its promise when "the circumstance causing the breach has made performance so vitally different than what was anticipated that the contract cannot reasonably be thought to govern."  *Eastern Air Lines, Inc. v. McDonnell Douglas Corp.*, 532 F.2d 957, 991 (5th Cir. 1976); *see also* Restatement (Second) of Contracts § 261 (1981).  In doing so, the doctrine responds to evolving "commercial practices and mores," *Transatlantic Fin. Corp. v. United States*, 363 F.2d 312, 315 (D.C. Cir. 1966), "in the interest of reason, justice and fairness," *Opera Co.*, 817 F.2d at 1099 (citing 6 Corbin, *Contracts* § 1331 (rev. ed. 1962)).

Because it sounds in equity, the doctrine of impossibility will not condone wrongful conduct.  *See City of New York v. Tavern on the Green, L.P.*, 427 B.R. 233, 244-45 (Bankr. S.D.N.Y. 2010) ("[T]o assert an equitable defense . . . the Debtors must come before the court with clean hands" (citing *Eppendorf-Netheler-Hinz GmbH v. Nat'l Scientific Supply Co.*, 14 F. App'x. 102, 105 (2d Cir. 2001)).  Courts have thus long refused to excuse performance where the party asking for absolution itself created the impossibility.  *See, e.g.*, *Doe v. Pataki*, 481 F.3d 69, 85 (2d Cir. 2007) ("'[I]f the adverse event is due to the fault of the obligor, the offending party cannot be heard to cry that performance is impracticable'" (citation omitted)); *United States v.*

16

*Winstar Corp.*, 518 U.S. 839, 895 (1996) ("[Impossibility] is traditionally unavailable where the barrier to performance arises from the act of the party seeking discharge . . . ."); *Seedman v. Friedman*, 132 F.2d 290, 296 (2d Cir. 1942) ("There has been much discussion in this case of the rule that performance of a contract is excused where it is forbidden by a judicial order.  We shall not, however, go into that problem further than to say that the rule is not applied where the fault of the party owing performance under the contract contributed to the order."); Restatement (Second) of Contracts § 261 (1981) (restricting the application of impracticability to parties whose "performance is made impracticable without his fault"); *id.* at cmt. d ("If the [supervening] event is due to the fault of the obligor himself, this Section does not apply."); Restatement (First) of Contracts § 457 (1932) (restricting impossibility to situations "the occurrence of which [the promisor] is not in contributing fault"); 30 Richard A. Lord, Williston on Contracts § 77:39 (4th ed. 2012) ("If a promisor is at fault for not having performed as promised, it cannot claim the defense of impracticability.").

This doctrine is not a proposition of bankruptcy law, but bankruptcy courts follow this fundamental rule.  *See, e.g.*, *In re Mr. Movies, Inc.* (287 B.R. 178, 186 (Bankr. D. Minn. 2002) (refusing to apply the doctrine of impossibility where the impossibility was "self-inflicted" because the doctrine "applies only in cases where an impossibility, whatever it may be, was not self created"); *In re Lawrence*, 238 B.R. 498, 501 (Bankr. S.D. Fla. 1999) (refusing to "recognize the defense of impossibility when the impossibility is self created"); *Matter of Fin. Corp.*, 17 B.R. 497, 504 (W.D. Mo. 1981) (refusing to excuse performance where "the bankrupt committed an act which contributed" the impossibility).  The principle is thus clear and deeply entrenched; Hostess cannot claim impossibility if it created its own hardship.

In rejecting this settled legal principle and applying the doctrine of impossibility, the Bankruptcy Court reasoned that the B&C Fund "was not compelled to terminate the debtors' participation, but chose to do so." *See* 06/19 Hrg. Tr. at p. 88. The Bankruptcy Court suggested that the B&C Fund, not Hostess, created the impossibility that Hostess claims. Yet neither Hostess nor the Bankruptcy Court cited any authority in support of the proposition that the intervening act of another somehow excuses an offending party's performance. They could not because none exists.

If a promisor is *at all* responsible for the impossibility, its breach will not be excused. Courts regularly refuse to excuse breach where the promisor's wrongful behavior provokes action by a third-party that makes performance impossible. For example, in *Lowenschuss v. Kane*, 520 F.2d 255, 265 (2d Cir. 1975), the Second Circuit determined that the defendant's performance of a contract was "rendered . . . impossible for all practical purposes" by a court's issuance of an order enjoining performance on antitrust grounds. But the Second Circuit went on to conclude that the defendant was not entitled to use the impossibility as an excuse for non-performance as a matter of law because "[i]mpossibility caused by a judicial order prohibiting performance will excuse a party's performance only if the fault of the party owing performance did not contribute to the order." *Id*. The court found that if the defendant knew that the contract was vulnerable to an injunction on antitrust grounds, "knowledge of its vulnerability to injunctive relief would bar G & W from later pleading the resulting injunction as an impossibility defense." *Id*. at 266. In that case, it was the action *of the court* in enjoining performance of the contract, or *of the third-party* that moved for the injunction, that directly created the impossibility. But the Second Circuit held that unless *the defendant* could be shown

to be wholly without fault in creating the impossibility, it was not entitled to rely on the defense of impossibility.[4]

Similarly here, while the action of the B&C Fund was the immediate cause of the impossibility, Hostess cannot credibly say that it was without fault in the situation.  Most obviously, it was Hostess' unilateral decision to cease making payments that set its termination in motion.  And Hostess failed to make these payments in the face of clear policy and repeated statements to it by the B&C Fund that continued delinquency would lead to the Company's termination.  *See* Brock ULP Affidavit at p. 4 (describing the B& C Fund's 120-day delinquency termination policy and notice letters sent to Hostess); Omnibus Objection, Exhibit B-1 at pp. 26, 28 (letters from the B&C Fund to Hostess threatening to terminate the Company's participation on December 10, 2011 in accordance with the Fund's 120-day delinquency policy).

Indeed, the rule is precisely the opposite of the one urged by Hostess.  "'One who contracts to render a performance or to produce a result for which it is necessary to obtain the cooperation of third persons is not excused by the fact that they will not cooperate,'" because the

---

[4] *See also Kiyoichi Fujikawa v. Sunrise Soda Water Works Co.*, 158 F.2d 490, 492 (9th Cir. 1946), *cert. denied*, 331 U.S. 832 (1946) (holding that a bank whose business was frozen by an executive order applying to businesses controlled by Japanese nationals could not be excused from repaying its depositors because it failed to apply for a readily obtainable license for limited operations); *Strategis Asset Valuation & Mgmt. v. Pac. Mut.*, 805 F. Supp. 1544, 1552 (D. Colo. 1992) (holding that purpose of contract was not frustrated where a third-party's foreclosure of promisor's property prevented a promised payment); Restatement (Second) of Contracts § 261 cmt. d, illus. 11 (1981) ("A contracts to construct and lease to B a gasoline service station. A valid zoning ordinance is subsequently enacted forbidding the construction of such a station but permitting variances in appropriate cases. A . . . makes no effort to obtain a variance, although variances have been granted in similar cases, and fails to construct the station. A's performance has not been made impracticable. A's duty to construct is not discharged, and A is liable to B for breach of contract."); *id*. at illus. 4 ("A contracts to sell and B to buy a specific machine owned by A to be delivered on July 30. On July 29, as a result of a creditor's suit against A, a receiver is appointed and takes charge of all of A's assets, and A does not deliver the goods on July 30. A's duty to deliver the goods is not discharged, and A is liable to B for breach of contract.").

promisor assumes the risk of that non-cooperation.  *Dworman v. Mayor and Bd. of Aldermen*, 370 F. Supp. 1056, 1070 (D.N.J. 1974) (quoting 6 A. Corbin, Contracts § 1340 (1950)); *accord Canadian Indus. Alcohol Co. v. Dunbar Molasses Co.*, 179 N.E. 383, 384 (N.Y. 1932) (Cardozo, C.J.) (refusing to excuse a seller's failure to deliver a promised quantity of molasses when the buyer's supplier failed to generate sufficient output).  Ultimately, then, the rule the Bankruptcy Court applied has no basis in the law.  Because Hostess knowingly induced the B&C Fund's actions by its own delinquency, the Company cannot claim impossibility as an excuse.[5]

### D.  Hostess' Payment of its Withdrawal Liability Will Not Satisfy its Obligation to the BCTGM

Finally, to the extent that the Bankruptcy Court concluded that the Fund's assessment of withdrawal liability has satisfied Hostess' obligations to the BCTGM, *see* 06/19 Hrg. Tr. at p. 86, its ruling misapprehends the nature of such liability.  When an employer withdraws or is expelled from a multiemployer pension plan, federal law requires that it pay a fee known as "withdrawal liability."  *See* 29 U.S.C. § 1381(a).  "An employer's withdrawal liability is its 'proportionate share of the plan's unfunded vested benefits,' that is, 'the difference between the present value of vested benefits' . . . 'and the current value of the plan's assets.'"  *Concrete Pipe & Products of Cal., Inc. v. Constr. Laborers Pension Trust Fund for S. Cal.*, 508 U.S. 602, 609 (1993) (quoting *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984)).  This underfunding

---

[5] It is not necessary for this Court to fashion a remedy under the circumstances.  In our briefs below, we identified several possible remedial mechanisms at a court's disposal.  *See* BCTGM Reply Brief at ¶¶ 21-23 & n.6 (outlining various methods for curing unjust enrichment, including establishing a 401(k) plan for current employees, escrowing the amounts for future severance payments, and paying the funds directly to the employees); *see also* BCTGM Supplemental Memorandum, Dkt. No. 1116 (June 15, 2012) at ¶¶ 9-14 (asking the court to direct payment of restitution damages, order the parties to mediate the dispute with regard to remedy).  Should this Court find that the BCTGM-represented workers are entitled to their full compensation in the post-petition period, the appropriate course would be to remand the matter to the bankruptcy court for further proceedings.

is calculated "as of the last day of the plan year preceding the year during which the employer withdrew," *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.*, 513 U.S. 515, 518 (1995) (emphasis omitted), and thus is a rough approximation of the "unfunded vested liability proportional to the employer's share of contributions to the plan during the years of its participation," *Concrete Pipe*, 508 U.S. at 610.  Withdrawal liability thus "has a retrospective aspect[.]"  *Central States, S.E. & S.W. v. Midwest Motor Express*, 181 F.3d 799, 803-04 (7th Cir. 2005).  It is not intended to, and does not, cover prospective obligations arising from work performed after withdrawal.  Thus, while paying its withdrawal liability may satisfy Hostess' statutory obligation to the Fund as of December 10, 2011, it does not satisfy prospective obligations arising from work performed under BCTGM CBAs after that date.

## CONCLUSION

For the forgoing reasons, this Court should reverse the bankruptcy court's order and remand the case for further proceedings to fashion an appropriate remedy.

Respectfully submitted,

/s/ Jeffrey R. Freund
Jeffrey R. Freund
Zoe L. Palitz
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth St., N.W., 10th Floor
Washington, D.C. 20005
Tel: (202) 842-2600
Fax: (202) 842-1888

*Counsel for the Bakery, Confectionery, Tobacco Workers and Grain Millers International Union and Affiliated Local Unions Representing Debtors' Employees*

Dated:  July 31, 2012